UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| TATE & LYLE INGREDIENTS | ) | |
|---|---|---|
| AMERICAS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-10-120-B-W |
| | ) | |
| TRANSPORT DISTRIBUTION, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

A food wholesaler moves for summary judgment in its breach of contract claim against a warehousing company. The Court concludes that the food wholesaler demonstrated that the warehousing company breached its contract, but there remain genuine issues of material fact regarding the nature and extent of damages.

**I.     STATEMENT OF FACTS**

**A.     Procedural History**

On March 30, 2010, Tate & Lyle Ingredients Americas, Inc. (Tate & Lyle) filed suit against Transport Distribution, LLC (Transport), alleging that Transport breached a warehousing contract and caused substantial economic damage to Tate & Lyle. *Compl.* (Docket # 1). On April 29, 2010, Transport answered and counterclaimed, making reciprocal claims that Tate & Lyle breached the contract. *Answer and Countercl.* (Docket # 6). On June 23, 2010, Tate & Lyle moved for

summary judgment on its own claims and against Transport's claims. *Mot. for Summ. J. of Pl. Tate & Lyle Ingredients Americas, Inc.* (Docket # 9) (*Pl.'s Mot.*). On July 28, 2010, Transport responded. *Opp'n of Def. Transport Distribution, LLC to Pl.'s Mot. for Summ. J.* (Docket # 13) (*Def.'s Opp'n*). Tate & Lyle replied on August 11, 2010. *Reply Br. in Supp. of Mot. for Summ J. of Pl. Tate & Lyle Ingredients Americas, Inc.* (Docket # 17) (*Pl.'s Reply*).

### B. The Warehousing Agreement and Its Breach

#### 1. The Warehousing Agreement

On or about November 1, 2007, Tate & Lyle entered into a three-year written contract with Transport for the storage of Tate & Lyle product.[1] *Pl.'s Statement of Material Facts* ¶¶ 1, 2 (Docket # 10) (PSMF); *Def.'s Opposing Statement of Material Fact* ¶¶ 1, 2 (Docket # 14) (DOSMF). The parties agree that the purpose of the Warehousing Agreement was for the storage of product but they agree on little else,

---

[1] Tate & Lyle's statement of material fact number 1 references the written contract between the parties, which is attached as an exhibit to the Affidavit of Barbara Hipple. PSMF ¶ 1; PSMF at Attach. 1, *Aff. of Barbara J. Hipple* (*Hipple Aff.*); PSMF at Attach. 2, *Warehousing Agreement* (*Warehousing Agreement*). Transport issued a qualified response to the attached contract, saying that the "Warehousing Agreement" is "a contract for the storage of <u>palletized</u>, <u>finished</u> product, and not for the storage of bulk super sacks of raw material." DOSMF ¶ 1 (emphasis in DOSMF). Transport cites paragraph 5 of the affidavit of Thomas McKenney. *Id.*; DOSMF at Attach. 1, *Aff. of Thomas J. McKenney* (*McKenney Aff.*). Although Mr. McKenney's affidavit states that the Warehousing Agreement was for the storage of palletized, finished product, the attached Warehousing Agreement states only that "Tate & Lyle is desirous of obtaining secure and safe warehousing facilities in 'Maine' for a portion of its products relating to the storing, packing, loading, routing and shipping of the products." *Warehousing Agreement* at 1. The Warehousing Agreement only touches on the definition of "product." *Id.* In paragraph 1(a), it states that "Transport acknowledges the products are foodstuffs for human consumption, and accordingly, that special precautions must be undertaken to safeguard the same." *Id.* It does contain a reference in Schedule A that Transport's charges will be based on storage and handling fees "per Pallet," *id.* at 8, but the Warehouse Agreement makes no reference to "palletized, finished product." The Court overrules Transport's qualified response to the Warehousing Agreement and accepts the attached copy of the Warehousing Agreement as the operative written contract between the parties.

2

and the contract provides only for storage of "products."² PSMF ¶¶ 1, 2; DOSMF ¶¶ 1, 2. In accordance with its and its vendors' obligations to follow applicable laws, Tate & Lyle required that the Warehousing Agreement mandate that Transport was to "observe, abide by and comply with all applicable laws, rules, ordinances, and regulations of federal, state, municipal and other governmental agencies in performing its obligations hereunder." PSMF ¶ 4; DOSMF ¶ 4. The Warehousing Agreement also contains a hold-harmless clause that required Transport to "pay on behalf of and hold harmless Tate & Lyle . . . [for] all loss, costs, damage and/or expense arising out of any claim, suit of judgment for damages or injuries to any person, firm or corporation whatsoever . . . caused or alleged to have been caused by Transport . . . in connection with work performed under this agreement." PSMF ¶ 6; DOSMF ¶ 6.

### 2. Tapioca Raw Starch and the Federal and State Inspections and Orders

During the contract, Transport stored raw tapioca starch (the tapioca) valued in excess of $2 million for Tate & Lyle. PSMF ¶ 7; DOSMF ¶ 7. In March 2009, during the term of the Warehouse Agreement, the Maine Department of

---

² In its statement of material fact number 3, Tate & Lyle asserts that [u]nder the terms of the Contract, Transport was responsible for providing warehouse facilities in Maine to Tate & Lyle while these products were in transit from Tate & Lyle's vendors to Tate & Lyle's production facilities and for providing services relating to the storage, packing, loading, routing and shipping of these products." PSMF ¶ 3. Transport denied Tate & Lyle's statement of material fact number 3 on the ground that the "contract relates to storage of foodstuffs and 'pallets' of products. None of the raw tapioca product acquired by Tate & Lyle was 'foodstuffs' and none was ever transported or delivered to Transport on pallets." DOSMF ¶ 3. The parties' versions of the Warehousing Agreement differ from the written terms of the Agreement. The Court credits Transport's denial to the extent Plaintiff's statement of material fact number 3 asserts that the Warehousing Agreement contains terms not actually contained in the Agreement, but not for the reasons Transport asserts, since its denial assumes that the Warehousing Agreement contains terms not actually contained in the Agreement.

3

Agriculture, Food & Rural Resources and the United States Food and Drug Administration (collectively, "Government") inspected three Transport warehouses in Houlton, Monticello, and Hodgdon, Maine (Warehouses) that Transport was using to store the tapioca for Tate & Lyle. PSMF ¶¶ 8, 9; DOSMF ¶¶ 8, 9. As a result of the inspections, the Government issued Form FDA 483 reports concerning the Warehouses. PSMF ¶ 10; DOSMF ¶ 10. The Form FDA 483 reports contained a number of findings regarding the Houlton, Maine Warehouse (Hangar) including:

1) Transport . . . is operating an unlicensed food establishment in the form of a food storage warehouse in violation of 22 M.R.S. § 2167. Said warehouse is actively engaged in the storage of food owned by Tate & Lyle;

2) The storage facility in Houlton has several critical deficiencies that have a direct impact on the food at this location, including water intrusion from runoff under doors/between floor & wall seams and from a leaky roof, loose fiberglass insulation, loose exposed pipe insulation over the food items (unconfirmed to possibly be asbestos), tops of storage bags laden with dirt, dust and unidentified filth, closed pail of hazardous processing material overturned in runoff water intruding into food storage area, storage drums containing unidentified material, open sewer lines providing direct venting of sewer gases into the facility, unprotected sprinkler pipes leaking onto food items, also noted were outer openings unprotected from rodent and pest entry and food stored in direct contact with the floor. The conditions as found render the facility incapable of being licensed as a food storage warehouse.

3) Food is being held under unsanitary conditions, which meets the definition of 'contaminate with filth' under 22 M.R.S., Chapter 551, § 2152 causing the food to be 'adulterated' as defined under 22 M.R.S., Chapter 551, § 2156.

PSMF ¶ 12; DOSMF ¶ 12. Regarding the Monticello, Maine (Arrow) warehouse, the Form 483 Reports stated:

> 1) Transport . . . does operate an unlicensed food establishment in the form of a food storage warehouse in violation of 22 M.R.S. § 2167. Said warehouse is actively engaged in the storage of food owned by Tate & Lyle.
>
> 2) The storage facility in Monticello had several critical deficiencies that had a direct impact on the food at this location, including water intrusion from runoff under doors and between floor/wall seams and from a leaky roof, exposed loose pink fiberglass insulation directly over product, also noted were outer openings unprotected from rodent and pest entry and food stored in direct contact with the floor. The conditions as found rendered the facility incapable of being licensed as a good storage warehouse.
>
> 3) Food is being held under unsanitary conditions, which meet the definition of 'contaminated with filth' under 22 M.R.S., Chapter 551, § 2152 causing the food to be adulterated as defined under 22 M.R.S., Chapter 551, § 2156.

PSMF ¶ 12; DOSMF ¶ 12. Finally, regarding the Hodgdon, Maine (Hodgdon) Warehouse, the Form 483 Reports stated:

> During the initial inspection of the [Hodgdon] food storage warehouse, the facility was not licensed pursuant to Chapter 344, Food Storage Warehouses. The Department found that food items intended for human consumption were stored in direct contact with the floor, which is an unsanitary practice, and the embargo was accordingly imposed.

PSMF ¶ 12; DOSMF ¶ 12. After the inspections and issuance of the 483 Reports, the Government embargoed quantities of Tate & Lyle's tapioca that had been stored at one or more of the Warehouses. PSMF ¶ 13; DOSMF ¶ 13. Because of the embargo, Tate & Lyle was prohibited from at least March 22, 2009, until March 27, 2009, from moving, processing, or otherwise using the stored tapioca.[3] PSMF ¶ 14; DOSMF ¶ 14.

---

[3] Tate & Lyle's statement of material fact number 14 did not specify the period of the embargo; Transport qualified its response to include the dates of the full embargo. The Court accepted Transport's qualified response to the extent it refers to the minimum period of embargo.

### 3. A Damages Dispute

Once the Government embargoed Tate & Lyle's tapioca, Tate & Lyle expended employee hours and incurred other costs in negotiating and cooperating with the Government toward the release or other disposition of the tapioca.[4] PSMF ¶ 16; DOSMF ¶ 16. Although the state of Maine initially embargoed all super sacks of raw tapioca, on March 27, 2009, "the State began releasing certain super sacks of raw tapioca stored in the Hodgdon warehouse." *Def.'s Additional Statement of Material Facts* ¶ 34 (Docket # 14) (DASMF). These super sacks were transported directly to Tate & Lyle's Houlton plant for processing into food ingredients. *Id*. From March 27, 2009, to date, Transport has continuously been able to deliver raw tapioca to Tate & Lyle to meet Tate & Lyle's production requirements of approximately 150 super sacks of raw tapioca product each week. *Id*. Ultimately, in January 2010, the state of Maine released for use in food processing all of the tapioca that Transport had held in storage. *Id*. The state of Maine's sequential release of the tapioca came about as a result of the intervention of State Senator Roger Sherman and the involvement of Maine Commissioner of Agriculture Seth Bradstreet. *Id*. ¶ 35.

---

[4] Transport interposed a qualified response to Tate & Lyle's statement of material fact sixteen, stating that Tate & Lyle had never provided Transport with a detailed statement of expenditures and costs that it incurred negotiating with the state of Maine. DOSMF ¶ 16. Tate & Lyle's statement of material fact sixteen did not ask Transport to admit a specific amount of time and expenditure only that Tate & Lyle expended some employee hours and incurred some costs in negotiating with the state of Maine. PSMF ¶ 16. The Court declines to accept Transport's qualified response and for purposes of the motion for summary judgment, accepts Tate & Lyle's contention that it expended an unquantified amount of time and expense in responding to the Government embargo.

Tate & Lyle uses tapioca for food applications only, and none of Tate & Lyle's manufacturing facilities is equipped to use tapioca as a raw material in non-food products, so any Government release of the tapioca for non-food applications was of no practical benefit to Tate & Lyle. PSMF ¶¶ 18, 19, 24; DOSMF ¶¶ 18, 19, 24. Tate & Lyle decided that the most cost-effective solution was to destroy the non-food tapioca.[5] PSMF ¶ 25; DOSMF ¶ 25.

### C. Positions of the Parties

#### 1. Tate & Lyle's Contentions

Tate & Lyle first contends that there is no dispute about whether Transport breached its Warehousing Agreement. *Pl.'s Mot.* at 7. It points out that the Warehousing Agreement expressly requires that Transport comply with Governmental laws and regulations and that, after a Government inspection, the Government determined that Transport had violated certain laws and, as a consequence, it embargoed Tate & Lyle's stored product. *Id.*

Tate & Lyle next contends that, as a result of Transport's breach, it lost tapioca valued at $504,766.79 and incurred disposal costs of $92,788. *Id.* As Transport is required to pay Tate & Lyle and hold it harmless for damages caused by Transport, Tate & Lyle contends that Transport owes it for these damages and

---

[5] Transport qualified its response to Tate & Lyle's statement of material fact number 25. DOSMF ¶ 25. Transport's qualified response disputed the reasonableness of Tate & Lyle's decision to destroy the tapioca, not whether Tate & Lyle in fact made the decision. The Court has accepted Tate & Lyle's assertion that it destroyed an unspecified amount of tapioca. Tate & Lyle's statement of material fact number 26 quantifies the amount of tapioca it destroyed, but Transport denied Tate & Lyle's assertion, stating that there never was any non-food tapioca. PSMF ¶ 26; DOSMF ¶ 26.

7

costs, and for its attorney fees as well. *Id.* It asserts that, as of the date it moved for summary judgment, these legal fees totaled "in excess of $365,090.00." *Id.*

Finally, Tate & Lyle assert that, because it must prevail against Transport for its breach of the terms of the Warehousing Agreement, Transport's counterclaim and affirmative defense of off-set must fail. *Id.* at 8.

### 2. Transport's Response

In its response, Transport denies virtually all of Tate & Lyle's legal contentions, including "whether the parties had a written contract for the storage of raw tapioca, whether there was, in fact, a breach of that contract, what damages, if any, Plaintiff suffered on account of any breach, and whether Defendant is entitled to any offset for money owed to it for storage of raw tapioca." *Def.'s Opp'n* at 3. On the issue of breach, Transport says it contracted with Tate & Lyle to "provide warehouse services for the palletized, finished foodstuff products of Tate & Lyle." *Id.* at 1. It says that it began to receive only finished product in fifty pound paper bags stacked and shrink-wrapped on pallets on November 27, 2007, and that on March 26, 2008, it began to receive raw tapioca for storage. *Id.* Transport admits that, until the Government's inspection, it had "traditionally always stored its bulk super sacks of raw tapioca directly on the floors of ships, docks, warehouses, truck trailers, and processing plants," but that the state of Maine concluded that Transport's storage violated Maine regulations and embargoed the tapioca. *Id.* at 2.

Transport goes on to say that, despite the Government embargo, it was always able to supply Tate & Lyle with an adequate supply of authorized tapioca

8

and that Tate & Lyle, for independent reasons, took it upon itself to unnecessarily destroy super sacks of raw tapioca. *Id.* Transport contends that, if Tate & Lyle had been more patient, the tapioca it destroyed would have been released without qualification by the Government. *Id.*

### 3. Tate & Lyle's Reply

Tate & Lyle replies that, despite Transport's denials, it is still entitled to summary judgment because "[i]n its opposition to Tate & Lyle's motion for summary judgment, Transport raises facts that are immaterial, and it attempts to create disputes of material facts without legitimate support." *Pl.'s Reply* at 1.

## II. DISCUSSION

The arguments of the parties are long on facts and short on law. The only case law in Tate & Lyle's two memoranda and Transport's opposition memorandum is a formulaic recitation of the familiar standards for evaluation of a motion for summary judgment. Since Tate & Lyle's motion is premised on its claim that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law, a motion for summary judgment that argues facts and cites no law takes an ineffective approach. In evaluating the motion, the parties have left the Court to its own devices.

### A. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

9

law." FED. R. CIV. P. 56(c)(2). For summary judgment purposes, "'genuine' means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a 'material fact' is one which might affect the outcome of the suit under the governing law." *Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006) (quoting *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218-19 (1st Cir. 2004)) (internal quotation marks omitted). "Neither conclusory allegations [nor] improbable inferences are sufficient to defeat summary judgment." *Carroll v. Xerox Corp.*, 294 F.3d 231, 236-37 (1st Cir. 2009) (citation and internal quotation marks omitted).

The summary judgment analysis for a breach of contract case depends upon the nature of the contract language; where the language is unambiguous, contract interpretation is a question of law for the court, where ambiguous, it is a question of fact for the jury. *FHS Props. Ltd. P'shp. v. BC Assocs.*, 175 F.3d 81, 87 n.7 (1st Cir. 1999) (citing *Canal Elec. Co. v. Westinghouse Elec. Co.*, 973 F.2d 988, 992 (1st Cir. 1992)). "[C]ontract language is ambiguous if the terms are inconsistent on their face, or if the terms allow reasonable but differing interpretations of their meaning." *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 586 (1st Cir. 1993). The initial determination of whether the language is ambiguous is a question of law for the court. *United States Liab. Ins. Co. v. Selman*, 70 F.3d 684, 687 (1st Cir. 1995).

**B.     Breach**

Under Maine law, to recover under a breach of contract claim, "a plaintiff must establish '(1) breach of a material contract term; (2) causation; and (3) damages.'" *BlueTarp Fin., Inc. v. E. Materials Corp.*, Civil No. 08-324-P-S, 2009 WL 2242617, at *13 (D. Me. July 24, 2009) (quoting *Me. Energy Recovery Co. v. United Steel Structures, Inc.*, 1999 ME 31, ¶ 7, 724 A.2d 1248, 1250). Transport posited the following defenses to the breach of contract claim: 1) that the parties did not enter into a written contract for the storage of raw tapioca; and 2) that there was no breach of the contract. *Def.'s Opp'n* at 3.

The Court first considers whether storage of the tapioca was covered by the Warehousing Agreement. The contract states in part:

> Tate & Lyle is desirous of obtaining secure and safe warehousing facilities in "Maine" for a portion of its products, and services relating to the storing, packing, loading, routing and shipping of the products . . .

*Warehousing Agreement* at 1. The contract further defines "products" as "foodstuffs for human consumption." *Id.* at 2. Tate & Lyle asserts that these contractual provisions address "the storage of raw food products acquired by Tate & Lyle," PSMF ¶ 3, which would include storage of the tapioca.

Transport argues to the contrary: that the Warehousing Agreement "is a contract for the storage of <u>palletized</u>, <u>finished</u> product, and not for the storage of bulk super sacks of raw material"; and characterizes the contract as "relat[ing] to storage of foodstuffs and 'pallets' of products." DOSMF ¶¶ 1, 3 (emphasis in original). It therefore maintains that "[n]one of the raw tapioca product acquired by Tate & Lyle was 'foodstuffs' and none was ever transported or delivered to Transport on pallets." *Id.* ¶ 3.

11

Transport's argument that the written contract was for a "palletized finished product," draws no support from the terms of the contract itself. *Id.* ¶¶ 1, 3. Similarly, Transport's proffered fact that "None of the raw tapioca product acquired by Tate & Lyle was 'foodstuffs,'" *Id.* ¶ 3, has no basis in the contract language, Mr. McKenney's affidavit, or any other portion of the summary judgment record. Transport's insistence that the tapioca is not "foodstuffs" is perplexing given Transport's admission that the tapioca was used by Tate & Lyle "for food applications only," PSMF ¶ 18, DOSMF ¶ 18, and its assertion that "[t]here never was any non-food tapioca," DOSMF ¶ 26.

The Court finds the relevant contract terms straightforward and unambiguous. Transport's argument to the contrary is not based upon a reasonable reading of the contract. *See Dorsk v. UNUM Life Ins. Cos. of Am.*, 8 F. Supp. 2d 19, 22 (D. Me. 1998) (Contract language was ambiguous where "the parties offer[ed] reasonable but differing interpretations of the [contract] language," and "both interpretations [were] plausible"). The Warehousing Agreement calls only for the warehousing of "products," which it defines as "foodstuffs for human consumption." *Warehousing Agreement* at 1. Tate & Lyle stated, and Transport admitted, that the tapioca was used only for food applications. The Court therefore concludes that the tapioca is a "foodstuff[] for human consumption," that fits squarely within the contract definition of "product." If Transport wished for different contract terms, it should have placed them in its agreement.

The Court turns to whether Transport breached the contract. At issue is the contractual provision requiring that Transport:

> observe, abide by and comply with all applicable laws, rules, ordinances, and regulations of federal, state, municipal and other governmental agencies in performing its obligations hereunder . . .

PSMF ¶ 4; DOSMF ¶ 4; *Warehousing Agreement* at 2. Again, as to this portion of the contract, the Court finds no ambiguity. Indeed, Transport presented no argument that the terms are anything other than clear. This conclusion is supported by Transport's admissions that the contract included the above provision, PSMF ¶ 4; DOSMF ¶ 4, that the Government inspected three of Transport's warehouses, PSMF ¶ 8; DOSMF ¶ 8, and that this inspection resulted in the issuance of Form FDA 483 reports which detailed multiple violations of Maine law.[6] PSMF ¶ 12; DOSMF ¶ 12. Coupling Transport's contractual obligation to comply with state law with its admission that it failed to do so compels the conclusion that Transport breached this provision of the Warehousing Agreement.

Transport gives no explanation for why it should avoid responsibility for breaching its contractual obligation to comply with state law. The Court finds

---

[6] At the Hangar warehouse, the Government found, *inter alia*, that Transport "is operating an unlicensed food establishment in the form of a food storage warehouse in violation of 22 M.R.S., § 2167," and that "[f]ood is being held under unsanitary conditions, which meets the definition of 'contaminated with filth' under 22 M.R.S., Chapter 551, § 2152 causing the food to be 'adulterated' as defined under 22 M.R.S., Chapter 551, § 2156." PSMF ¶ 12; DOSMF ¶ 12.

At the Arrow warehouse, the Government found*, inter alia*, that Transport "does operate an unlicensed food establishment in the form of a food storage warehouse in violation of 22 M.R.S., § 2167," and that "[f]ood is being held under unsanitary conditions, which meet the definition of 'contaminated with filth' under 22 M.R.S., Chapter 551, § 2152 causing the food to be adulterated as defined under 22 M.R.S., Chapter 551, § 2156." PSMF ¶ 12; DOSMF ¶ 12.

At the Hodgdon warehouse, the Government found that "the facility was not licensed pursuant to Chapter 344, Food Storage Warehouses." PSMF ¶ 12; DOSMF ¶ 12.

unavailing Transport's attempt to divert attention to Tate & Lyle by asserting that Tate & Lyle inspected and approved the Transport warehouses; the contract expressly places the burden of legal compliance on Transport alone. It does not provide that Tate & Lyle's inspection alleviates Transport's obligation to "comply with all applicable laws, rules, ordinances, and regulations."

The Court finds similarly unpersuasive Transport's attempts to misrepresent the findings in the Form FDA 483 reports. While admitting that the Government found certain violations, Transport characterizes the findings as revealing "the transportation and storage process *utilized by Tate & Lyle* to be contrary to the regulations of the Maine Department of Agriculture." *Def.'s Opp'n* at 2 (emphasis added). The reports say no such thing. Rather, the reports are silent as to Tate & Lyle's "transportation and storage process," and speak only to deficiencies in Transport's facilities. Moreover, to the extent that Tate & Lyle may have violated any laws in shipping the tapioca to Transport,[7] those violations have no bearing on Transport's own violations once the tapioca was placed in its warehouses.[8]

The Court concludes that: 1) Tate & Lyle demonstrated that it contracted with Transport to warehouse its product; 2) in the contract Transport expressly

---

[7] Much of Transport's opposing brief and the related facts and exhibits concerns Tate & Lyle's treatment of the tapioca in its own facilities, and allegations that before the arrival at Transport's facilities, the tapioca was stored "directly on the floors of ships, dock platforms, warehouse floors and truck floors." *McKenney Aff.* ¶ 9.

[8] It may be that some of the Government-identified deficiencies—particularly the unpalletized storage of food items "in direct contact with the floor"—were initially the result of the Tate & Lyle's delivery of the tapioca to Transport without pallets. PSMF at Attach. 4, 5, 6; *Def.'s Opp'n* at 2. Once the tapioca was placed in Transport's warehouses, however, the burden was Transport's—not Tate & Lyle's—to ensure compliance with applicable laws. If compliance necessitated the storage of the tapioca on pallets, under the contract, it was Transport's responsibility to provide them.

14

agreed to comply with all state laws; and, 3) Transport admitted that it failed to do so. In short, Transport breached the contract.

C. **Damages**

Despite Tate & Lyle's contentions to the contrary, there are multiple genuine issues of material fact regarding damages. Mr. McKenney asserts that the state of Maine began releasing some super sacks of raw tapioca from the Hodgdon warehouse on March 27, 2009 for use in food preparation, and that Transport was continuously able to supply Tate & Lyle's needs for tapioca. *McKenney Aff.* ¶¶ 18-20. He claims that Tate & Lyle, in effect, caused its own damage by unnecessarily and prematurely dumping tapioca in October. *Id.* ¶ 22.

Neither Tate & Lyle nor Transport fully developed their arguments on damages. Transport essentially denied all of Tate & Lyle's statements of material fact regarding damages. Faced with what appears to be genuine issues of material fact, Tate & Lyle urges the Court to reject Transport's denials contending that they are supported only by a bare sworn statement in the McKenney Affidavit. *Pl.'s Reply* at 5-6 (stating that Mr. McKenney's statement is "nothing more than opinion and supported by Mr. McKenney's affidavit by implication at best, reflects no personal knowledge of the decision-making process within Tate & Lyle that [led] to the destruction of the Tapioca").

The Court disagrees. By denying Tate & Lyle's assertions, Transport properly placed into question the nature, extent, and cause of Tate & Lyle's damages. Tate & Lyle's claims that there are deficiencies in Mr. McKenney's

15

affidavit raise issues of credibility to be weighed by the jury. A party opposing a motion for summary judgment is entitled to rely on affidavits to demonstrate that there exist issues of material fact. Indeed, Rule 56 expressly contemplates the submission of affidavits to refute a motion for summary judgment. FED. R. CIV. P. 56(e)(2) ([A]n opposing party . . . must—*by affidavits* or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." (emphasis added)). At the same time, conclusory allegations in an affidavit are insufficient to challenge a motion for summary judgment. "The object of [Rule 56] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n,*, 497 U.S. 871, 888 (U.S. 1990). Rather, the affidavit must refute some specific fact rather than make a general allegation. *Id.* at 888-89. Moreover, an "opposing affidavit must be made on personal knowledge . . . ." FED. R. CIV. P. 56(e)(1). "This requisite personal knowledge must concern facts as opposed to conclusions, assumptions, or surmise." *Livick v. The Gillette Co.*, 524 F.3d 24, 28 (1st Cir. 2008) (quoting *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001)) (internal quotation marks omitted).

Transport denies the damages alleged by Tate & Lyle, arguing that Tate & Lyle disposed of the tapioca prematurely and "without any clear understanding of the likely timetable for the release of the embargo . . . ." DOSMF ¶ 25. Tate & Lyle is correct in observing that the sole basis for Transport's denial is Mr. McKenney's affidavit, but incorrect that Mr. McKenney lacks the requisite personal knowledge to make the affidavit.

16

First, Mr. McKenney's affidavit states that it is based on his own personal knowledge and in the context of a motion for summary judgment, the Court must credit his statement. *McKenney Aff.* (stating that Mr. McKenney "hereby make[s] the following statements on the basis of my personal knowledge"). Moreover, Tate & Lyle's own Statement of Material Fact further establishes Mr. McKenney's personal knowledge as to the Government's investigation and embargo timetable. Letters attached to Tate & Lyle's Statement of Material Fact demonstrate Mr. McKenney's personal involvement in both the investigation and the embargo; three of the letters were addressed directly to Mr. McKenney, PSMF at Attach. 4, 5, 7, and the final letter additionally references a meeting among the Government, Tate & Lyle, and Mr. McKenney during which the embargo was discussed. PSMF at Attach. 7 ("As discussed during our meeting of October 16, 2009 the Maine Department of Agriculture authorizes the release of all remaining product . . . now housed at the Hodgdon warehouse to be used in a **NON-FOOD** application." (emphasis in original)). The Court concludes that Mr. McKenney's assertions regarding the investigation and embargo timetable are based upon personal knowledge and that, by extension, Transport's general denial of damages is based upon Mr. McKenney's personal knowledge.

In summary, Tate & Lyle's affidavit asserting damages is contradicted by Transport's affidavit denying them. All of this is grist for the fact-finder's mill. The adequacy of the foundation for Mr. McKenney's personal knowledge, the credibility of his opinions, the extent of Tate & Lyle's consequential damages, are all matters

17

that cannot be resolved on this record. The Court is obligated to view the facts in the light most favorable to Transport and this obligation dooms Tate & Lyle's attack on Transport's view of the facts.

## III. CONCLUSION

The Court GRANTS in part and DENIES in part Tate & Lyle Ingredients Americas, Inc.'s motion for summary judgment (Docket # 9). The Court GRANTS the motion insofar as it claims that Transport Distribution, LLC breached its Warehousing Agreement with Tate & Lyle Ingredients Americas, Inc. and DENIES the motion insofar as it claims that it sustained damage as a result of Transportation Distribution, LLC's breach.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 21st day of October, 2010